1:20 MJ 9111

I, L. John Matthews, a Law Enforcement Officer with the Federal Bureau of Investigation, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.      I am a Special Agent with the Federal Bureau of Investigation (FBI), and I have been so employed since 1997.  In April 1997, I reported to the San Diego Field Office where I conducted counterintelligence and counterterrorism investigations.  Upon reporting to the FBI's Cleveland Field Office in January 2019, I was assigned (and continue to be assigned) to the office's Counterintelligence Squad, where I have been responsible for counterintelligence investigations including economic espionage, violations of intellectual property rights, counter-proliferation, and other national security matters.  In addition to my work experience, I received specialized training in the field of counterintelligence investigations from the FBI and others.

2.      The information contained in this affidavit is based on information personally known to me from my work on the investigation described herein, as well as information I received from other law enforcement agents assisting in this investigation.  This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint and arrest warrant and does not set forth all of my knowledge about this matter.

3.      Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that Dr. Qing Wang, a.k.a. Kenneth Wang (Dr. Wang) committed violations of Title 18, United States Code, Section 287 (False Claims) and Title 18, United States Code, Section 1343 (Wire Fraud), related to more than $3.6 million in grant funding that Dr. Wang and his research group at the Cleveland Clinic Foundation (CCF) received from the National Institutes of Health (NIH).

1

## JURISDICTION

4.      This Court has jurisdiction to issue the requested complaint and arrest warrant

because it is "a court of competent jurisdiction" as defined by 18 U.S.C. §§ 2711, 2703(a),

2703(b)(1)(A), and 2703 (c)(1)(A).  Specifically, the Court is "a district court of the United

States . . . that has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

## PROBABLE CAUSE

5.      The NIH, a part of the United States Department of Health and Human Services,

is the nation's primary medical research agency, with an annual operating budget of $39 billion.

The NIH designates approximately $32 billion each year to be awarded to American universities

and research professors via federal grants for medical research.  Once NIH awards a grant, the

grantee enters the payment request in the Payment Management System (PMS) from their

location.  The payment is processed at PMS in Bethesda MD.  PMS submits an electronic

Automated Clearing House (ACH) File to the Federal Reserve Bank (FRB) Data Center in New

Jersey via the FRB's Fedline Advantage ACH application.  The ACH Application sends payment

instructions to the financial institutions.  The financial institutions debit or credit the recipient's

accounts as instructed on the settlement date.

6.      In the present case, Dr. Wang knowingly made or presented false claims to the

NIH to obtain money and property by means of false or fraudulent pretenses, representations,

and promises by failing to disclose to NIH that he held an affiliation and the position of a Dean

at Huazhong University of Science and Technology (HUST) and received multiple grants from

National Natural Science Foundation of China (CNSF) that overlapped the same scientific

research as his NIH grant funding.  As such, Dr. Wang's false and fraudulent pretenses,

representations, and promises lead NIH to approve and fund more than $3.6 million in grants via

2

interstate wire transfer through NIH's PMS to Dr. Wang and his research group at CCF, located in the Northern District of Ohio.

7.        Dr. Wang was born in the People's Republic of China (PRC).[1]  Dr. Wang accepted a research position with the Cleveland Clinic in 1997.  Dr. Wang is a professor at the Lerner Research Institute and a Professor of Molecular Medicine at Case Western Reserve University.  His areas of interest are Genetics and Cardiovascular disease.  Dr. Wang became a United States citizen through naturalization on November 5, 2005.

8.        In the past few years, both the NIH and National Science Foundation have recognized that research funded by the United States is often illegally taken to the People's Republic of China.  As a result of this recognition, investigators from these two agencies have heightened their interest in vetting the recipients, post-grant awarding.

The Cleveland Clinic received a letter dated January 14, 2019, from Dr. Michael Lauer[2], Deputy Director for Extramural Research at NIH ("the NIH letter"), advising:

> It has come to our attention that there are issues of potential noncompliance with NIH policies regarding disclosure of outside research support and relevant affiliations or foreign components at the Cleveland Clinic Lerner College of Medicine.
>
> As you are aware, the NIH Grants Policy Statement, Section 1.2, defines "other support" as *all* financial resources, whether Federal or non-Federal, commercial or institutional, available in direct support of an individual's research endeavors, including but not limited to research grants, cooperative agreements, contracts, and/or institutional awards. This includes research support from foreign governments or entities. Applicants must provide updated other support information prior to award via just-in-time and are required to identify any changes in other support in each annual progress report. In addition, the PHS [Public Health Service] Financial Conflict of Interest Regulations, 42

---

[1] "PRC" and "China" are employed interchangeably throughout this Affidavit.

[2] Dr. Lauer is the principal scientific leader and advisor to the director of NIH on all matters related to substance, quality and effectiveness of NIH extramural research programs and administration.

CFR 50, Subpart F, require investigators to disclose to their institution all significant
financial interests including those related to funds received from a foreign institution of
higher education or the government of another country. NIH recently reminded the
community of this requirement in NOT-OD-18-160. NIH relies on institutions, as the
applicants and recipients of NIH funding, to ensure that individual investigators make all
appropriate disclosures regarding other support, affiliations and financial interests to their
institution, whether or not they are employees of the institution. Institutions, in turn, must
ensure that all applications and reports submitted to NIH are complete and accurate.

When applying for an NIH grant, the applicant is required to indicate whether the project
includes a "foreign component," and, if yes, to provide a foreign justification document.
When institutions wish to add a foreign component post-award, prior NIH approval is
required, as outlined in the NIH Grants Policy Statement Section 8.1.2.10. A foreign
component is defined in the NIH Grants Policy Statement, Section 1.2, as performance of
any significant element or segment of the project outside the United States either by the
recipient or by a researcher employed by or affiliated with a foreign organization,
whether or not grant funds are expended.

NIH has become aware that applications submitted to the NIH for the investigator named
below may have failed to comply with the above policies regarding other support,
disclosing foreign financial interests, and/or obtaining NIH prior approval for the use of
foreign components on NIH awards.

9.      NIH sent this letter to the Clinic based on its administrative investigation of Dr.

Wang.  As a Professor of Molecular Medicine at the Cleveland Clinic Lerner College of

Medicine, Dr. Wang served as Principal Investigator, or the individual responsible for the

preparation, conduct and administration of a research grant, on two active NIH awards:  R01

HL121358 and R01 HL126729.  However, Dr. Wang also holds an affiliation and the position of

a Dean at HUST.  In addition, the Chinese government selected Dr. Wang for the Chinese

Thousand Talents Program in 2008.  As more fully discussed below, selection into the Thousand

Talents Program usually included a monetary stipend from the Chinese government.  At least

one National Natural Science Foundation of China (CNSF) grant is associated with Dr. Wang

(#91439129).  Several of Dr. Wang's NIH-supported publications were also supported by foreign

awards, suggesting foreign collaborations, which Dr. Wang did not disclose to NIH.  NIH's

investigation determined that Dr. Wang, through the grant applications submitted by the Cleveland Clinic, failed to disclose Dr. Wang's true affiliation at HUST as a Dean, the receipt of funding from CNSF, Dr. Wang's participation in the Thousand Talents Program, and designations of Dr. Wang as the Principal Investigator in applications and progress reports of foreign projects.

10.     HUST's website contained the following statement regarding its mission and its relationship to the Chinese government:

> The Huazhong University of Science and Technology (HUST) is a national key university directly under the administration of the Ministry of Education of P. R. China, and is among the first Universities joining the national "211 Project" and "985 Project".  It was founded on May 26, 2000, as a result of the merger of the former Huazhong University of Science and Technology, Tongji Medical University and Wuhan Urban construction Institute.[3]

**DUTY TO DISCLOSE FOREIGN GRANT SUPPORT**

11.     Disclosure of foreign grant support to NIH should occur when a researcher presents a description of the researcher's foreign grants in response to an inquiry from the NIH about the existence of "Other Support."  According to the NIH, disclosure of other support is required for a variety of reasons:

> Information on other support assists awarding agency staff in the identification and resolution of potential overlap of support. ***Overlap, whether scientific, budgetary, or commitment of an individual's effort greater than 100 percent, is <u>not permitted</u>***. The goals in identifying and eliminating overlap are to ensure that sufficient and appropriate levels of effort are committed to the project; that there is no duplication of funding for scientific aims, specific budgetary items, or an individual's level of effort; and only funds necessary to the conduct of the approved project are included in the award. Budgetary overlap occurs when duplicate or equivalent budgetary items (e.g., equipment, salary) are requested in an application but are already provided for by another source.

---

[3] The 211 Project and 985 Projects are often referenced as being a part of China's Thousand Talents Program that is described in greater detail later in the affidavit.

NIH Notice NOT-03-029 (emphasis added).

12.    When other support is properly declared by a researcher, both the researcher's home institution and the NIH can evaluate the presence of overlap and determine whether to approve an application for an NIH award, or, from NIH's perspective, determine whether to fund an application for an award, or perhaps adjust previously awarded funding to reflect the presence of another source of funding for the same research:

> The Institute/Center scientific program and grants management staff review other support information prior to award.  Resolution of overlap occurs at the time of award in conjunction with applicant institution officials, the principal investigator, and awarding agency staff. NIH staff continue to monitor changes to other support information throughout the project as part of the annual progress reviews.

NIH Notice NOT-03-029.

13.    In addition, as stated by Dr. Lauer in NIH's January 14, 2019 correspondence to the CCF, the NIH Grants Policy Statement (GPS), Section 1.2, defines "other support" as all financial resources, whether Federal or non-Federal, commercial or institutional, available in direct support of an individual's research endeavors, including but not limited to research grants, cooperative agreements, contracts, and/or institutional awards. ***This includes research support from foreign governments or entities***.  ***Applicants <u>must provide</u> updated other support information prior to award via just-in-time and are required to identify any changes in other support in each annual progress report***. (emphasis added).  In addition, the PHS [Public Health Service] Financial Conflict of Interest Regulations, 42 CFR 50, Subpart F, required Primary Investigators to disclose to their institution all significant financial interests, ***including those related to funds received from a foreign institution of higher education*** or the government of another country. (emphasis added).

6

14.     Before a Primary Investigator, or any other member of the designated research team, on a NIH-funded grant can cooperate with or accept support from a foreign component, NIH must approve such cooperation and support.  A foreign component is defined in the NIH Grants Policy Statement (GPS) Section 1.2 as "the performance of any significant scientific element or segment of a project outside of the United States, either by the recipient or by a researcher employed by a foreign organization, whether or not grant funds are expended. Activities that would meet this definition include, but are not limited to, (1) the involvement of human subjects or animals, (2) extensive foreign travel by recipient project staff for the purpose of data collection, surveying, sampling, and similar activities, or (3) any activity of the recipient that may have an impact on U.S. foreign policy through involvement in the affairs or environment of a foreign country."

15.     Initial grant applications include a question on form G.220 – R&R Other Project Information, which asks, "Does this project involve activities outside of the United States or partnerships with international collaborators?"  If yes, then the applicant must include a Foreign Justification attachment.  NIH reviewers can comment on whether the foreign site (component) is justified.  The NIH Program Official (PO) or Grants Management Staff (GMS) must record the foreign component in the NIH Foreign Award and Component Tracking System (FACTS), and in some cases get State Department approval.  Adding a new foreign component to an active grant requires prior approval from the NIH.

16.     In July 2019, NIH reiterated this longstanding policy, in place since at least 2010, in a notice to the research community entitled "Reminders of NIH Policies on Other Support and on Policies related to Financial Conflicts of Interest and Foreign Components,"  In that notice (NOT-OD-19-114), the NIH stated:

7

The NIHGPS [National Institutes of Health Grants Policy Statement] 2.5.1, states that other support includes all financial resources, whether Federal, non-Federal, commercial or institutional, available in direct support of an individual's research endeavors, including, but not limited to, research grants, cooperative agreements, contracts, and/or institutional awards to ensure no scientific, budgetary or commitment overlap.

In NOT-OD-19-114, the NIH also described the importance of accurately listing "Other Support" provided by foreign entities:

NIH reminds applicants and recipients that other support includes all resources made available to a researcher in support of and/or related to all of their research endeavors, regardless of whether or not they have monetary value and regardless of whether they are based at the institution the researcher identifies for the current grant. This includes resource and/or financial support from all foreign and domestic entities, including but not limited to, financial support for laboratory personnel, and provision of high-value materials that are not freely available (e.g., biologics, chemical, model systems, technology, etc.).

17.    As Dr. Lauer stated on behalf of the NIH in the NIH letter:

When applying for an NIH grant, the applicant is required to indicate whether the project includes a "foreign component," and, if yes, to provide a foreign justification document. When institutions wish to add a foreign component post-award, prior NIH approval is required, as outlined in the NIH Grants Policy Statement Section 8.1.2.10.  A foreign component is defined in the NIH Grants Policy Statement, Section 1.2, as performance of any significant element or segment of the project outside the United States either by the recipient, or by a researcher employed by, or affiliated with a foreign organization, whether or not grant funds are expended.

18.    Section 2.3.6 of the NIH GPS states that the signature of an Authorized Organization Representative (AOR) on the application certifies that the organization will comply with all applicable assurances and certifications referenced in the application.  The NIH application instructions state that "Deliberate withholding, falsification, or misrepresentation of information could result in administrative actions, such as withdrawal of an application, suspension and/or termination of an award, debarment of individuals, as well as possible criminal and/or civil penalties."

8

19.    In addition, Section 2.3.7.6 of the NIH GPS requires the applicant organization "to secure and retain a unique signature and dated assurance from the PI for each submitted application, prior to submitting an application to the NIH.  This assurance must be available to the NIH, or other authorized Department of Health and Human Services, or Federal officials upon request.  Such an assurance must include at least the following certifications:  1) ***that the information submitted within the application is true, complete and accurate to the best of the PI's knowledge***; 2) that any false, fictitious, or fraudulent statements or claims may subject the PI to criminal, civil, or administrative penalties; and, 3) that the PI agrees to accept responsibility for the scientific conduct of the project and to provide the required progress reports if a grant is awarded as a result of the application." (emphasis added).

20.    When submitting a Just-In-Time document to the NIH as part of the grant application process under Section 12.12.3 of the NIH GPS, the Applicant and Organization Certification and Acceptance message displays the following as a pop-up:

> I certify that the statements herein are true, complete, and accurate to the best of my knowledge, and accept the obligation to comply with Public Health Services terms and conditions if a grant is awarded as a result of this application. I am aware that any false, fictitious, or fraudulent statements or claims may subject me to criminal, civil, or administrative penalties.

21.    When submitting a progress report (RPPR) to the NIH under Section 13.4, the Submit RPPR screen displays a certification statement.

> "In submitting this RPPR, the SO (or PD/PI with delegated authority), certifies to the best of his/her knowledge that the grantee organization is in compliance with the terms and conditions specified in the Notice of Award and Grants Policy Statement, and verifies the accuracy and validity of all administrative, fiscal, and scientific information in the progress report.  The SO (or PD/PI with delegated authority) further certifies that the grantee organization will be accountable for the appropriate use of any funds awarded and for the performance of the grant-supported project or activities resulting from the progress report.  Deliberate withholding, falsification, or misrepresentation of information could result in administrative actions such as withdrawal of a progress report,

9

suspension and/or termination of an award, debarment of individuals, as well as possible criminal penalties.  The grantee institution may be liable for the reimbursement of funds associated with any inappropriate or fraudulent conduct of the project activity."

22.    The investigation determined that on at least four different occasions, Dr. Wang had the opportunity and obligation to disclose his Chinese grants, his position as Dean at HUST, and the scientific, budgetary and commitment of effort overlap between his NIH and CSNF grants, but knowingly and willfully failed to do so on the following submissions to NIH:

| DATE SUBMITTED BY DR. WANG THROUGH CCF | NIH GRANT | TYPE OF REPORT | SECTION/ QUESTION | CSNF GRANT |
|---|---|---|---|---|
| 5/01/2014 | RO1 HL121358 | Just-In-Time Document | GPS 2.5.1 "Other Support" | CNSF 31430047 CNSF 9149129 |
| 3/16/2015 | RO1 HL121358 | Progress Report (RPPR) | D.2.c "Changes in Other Support | CNSF 31430047 CNSF 9149129 |
| 3/11/2016 | RO1 HL121358 | Progress Report (RPPR) | D.2.c "Changes in Other Support | CNSF 31430047 CNSF 9149129 |
| 3/8/2017 | RO1 HL121358 | Progress Report (RPPR) | D.2.c "Changes in Other Support | CNSF 31430047 CNSF 9149129 |

**CLEVELAND CLINIC INVESTIGATION**

23.     Dr. Serpil Erzurum, the Director and Chair of the Lerner Research Institute, and

Dr. Stanley Hazen, Chair of the Cardiovascular & Metabolic Sciences Department and Dr.

Wang's supervisor, advised that CCF provided extensive training and education to all of its

researchers regarding their obligation to disclose all other sources of funding under NIH's GPS

Sections – both before NIH grants were approved and funded as well as periodically during the

life of the grant.  In addition, they advised that CCF required Dr. Wang to complete an annual

Conflict of Interest (COI) in CCF's system that advised Dr. Wang that he was required to

disclose any and all financial interests, fiduciary roles and research activities outside of CCF.

They further advised that before Dr. Wang could complete and submit his COI for years 2014

through 2018 the system required him to acknowledge his understanding of CCF's conflict of

interest policies, which Dr. Wang did.  Finally, Dr. Hazen advised he specifically reiterated Dr.

Wang's obligation to disclose all other sources of funding, including foreign grants, during his

annual review interview with Dr. Wang.

24.     Upon receipt of the above NIH letter, the Cleveland Clinic instituted an internal

investigation of Dr. Wang.  The Clinic's investigation reached the same conclusions as the NIH's

investigation, and found that Dr. Wang failed to disclose the same information discussed above

in paragraph 22 to the Clinic as well.  The Clinic also concluded that Dr. Wang violated the

Cleveland Clinic Office of Sponsored Research policy, financial policy, and the federal NIH

policy for lack of reporting his Chinese-funded work and affiliations.

25.     On March 3, 2020, the Cleveland Clinic interviewed Dr. Wang.  Dr. Wang

admitted to applying for, and accepting, a position with China's Thousand Talent Program (TTP)

in 2008 – eleven (11) years after becoming a CCF employee – and that, as a result of his

11

admission into the TTP,  China provided $3 million in research support to enhance the facilities

and operations at the Key Lab at HUST, building out the core facility, and Dr. Wang became

Dean of the College of Life Sciences at HUST.  Dr. Wang said he used the funds to bring the

College of Life Sciences at HUST in China to a new level.  Dr. Wang also admitted to becoming

the Director of the Key Laboratory of Molecular Biophysics of the Ministry of Education at

HUST in 2007.  Dr. Wang advised he was also Director of Human Genome Research Center at

HUST.

      26.     Later in the March 3, 2020, interview, Dr. Wang advised that China, through

HUST, provided him with free travel and lodging for his trips to China.  Initially, Dr. Wang

falsely stated that the lodging provided by HUST was a dorm room on-campus, but then

admitted that he had a three-bedroom apartment on campus that is devoted to his personal use

where he stores clothes and personal items.[4]  Dr. Wang also admitted he personally recruited

around 40 to 50 researchers for HUST, which your Affiant knows to be a requirement of the

Thousand Talents Program.  Dr. Wang further explained that he would sometimes hold

recruiting events in the United States.  He recalled hosting events at Harvard Medical School in

Boston, University of California at San Francisco, and University of Texas Southwestern.  Dr.

Wang said the package he offered on behalf of HUST included personal compensation to each

recruited person that could be two or three million Chinese Yuan (around $200,000 to $300,00).

He could also offer research funding, access to graduate students, and lab space.  Dr. Wang

---

[4] It is your Affiant's understanding as part of the investigation in this matter that China's
providing of such a large accommodation as provided to Dr. Wang is normally reserved for
highly regarded and accomplished Thousand Talent members.

claimed that he did not recruit anyone from Cleveland Clinic, but he also claimed that he has not received a salary or any personal compensation for his employment at HUST or the Thousand Talents Program, which your Affiant knows to be contrary to how the Thousand Talents Program operates, as further described below.

27.     CCF's investigation determined that Dr. Wang failed to disclose any of these activities, his Deanship(s) at HUST, or any of his Chinese grants in his COI submissions from 2014 through 2018.

**THOUSAND TALENTS PROGRAM**

28.     Based on my training and experience, the Chinese Talent Plans are programs established by the Chinese government to recruit individuals with access to or knowledge of foreign technology and intellectual property.  The importance of the Thousand Talent program was memorialized in 2007, when "talent development" was added to the Constitution of the Communist Party of China.  The Thousand Talent program requires participants sign contracts obligating them to perform both typical academic, research, or entrepreneurial activities on behalf of Chinese institutions, as well as recruitment activities.

29.     Each Talent Plan has the same basic requirements:  the applicant should have experience in cutting-edge foreign science or engineering research; possess a degree from a prestigious university; and have several years of overseas work or research experience at prestigious universities, research institutes, corporations, or well-known enterprises.

30.     To entice high-caliber applicants - particularly applicants willing to relocate to China - the Chinese government rewards Talent Recruits with significant financial and social incentives.  Each Talent Recruit draws a salary from a Chinese "employing unit," such as a laboratory or research organization that often meets or exceeds salaries the Talent Recruits draw

13

through their non-Chinese employment.  The Chinese government has been known to provide Talent Recruits with signing bonuses of up to $150,000, and an additional $450,000-$750,000 over time to support their research.  Additional funding is available depending on the Talent Recruit's level of expertise and quality of performance in meeting Talent Plan goals.  The Chinese government may also supply free housing or a generous housing allowance, high-quality schooling for children, jobs for spouses, healthcare, and significant tax breaks.  Talent Plan funding is almost always provided tax-free.

31.     Talent Plan contracts almost always specify significant goals to be accomplished during the term of their contract.  Failure to meet Talent Plan contract goals can result in the loss of funding or dismissal.  This contractual obligation closely resembles or even replicates the work the Talent Recruit performs or performed for his or her U.S. employer, thus demonstrating the Talent Recruit's willingness to leverage knowledge and intellectual property obtained from U.S. businesses, corporations, and even U.S. government laboratories.  Due to the similarities between Talent Recruits' work in the United States and the Talent Plan research they are obligated to perform in China, many Talent Recruits eventually draw upon their knowledge and experience derived from their current and former positions in the United States, resulting in unauthorized, and, often illegal transfers of intellectual property from the United States to China.

32.     Subsequent to the NIH letter, Dr. Wang produced a letter to CCF dated January 18, 2019, reportedly from Tao Zhang, General Director of HUST, Wuhan, China, addressed to "To Whom It May Concern, Case Western Reserve University, Cleveland Clinic, NIH, and Others" falsely stating that Dr. Qing Wang was only an adjunct faculty member at HUST, and that Dr. Wang's participation in the Thousand Talents Program was only for five years, ending in 2013 – which was coincidently the year just before the initial NIH grant application.  Your

14

Affiant knows this assertion to be false since Dr. Wang was still a Dean at HUST after 2013, and he continued to receive funding through Chinese grants.  The letter also claimed that Dr. Wang did not receive salary support, but confirmed that HUST provided "international, domestic and local business transportation, accommodation[5] and other traveling expenses (per diem).  Based on your Affiant's training and expertise and because of the false representations in this letter regarding Dr. Wang's position, employment status, and failure to disclose Dr. Wang's Chinese grant funds subsequent to 2013, your Affiant believes that Dr. Wang produced this letter in an effort to shield himself from civil liability and/or criminal culpability.

33.     Coinciding with Dr. Wang's selection for the Chinese Thousand Talents Program, beginning in 2008, Dr. Wang served as the Director of the Human Genome Research Center at HUST and served as the Dean of HUST[6].  In a teleconference on Monday April 20, 2020, Dr. Lauer, explained that adjunct instructor positions are largely honorary and involve relatively small devotion of resources, perhaps involving teaching a class or conducting lectures.  However, the position of Dean at a university required a significant time investment and was considered a conflict by NIH.

34.     On April 28, 2020, Dr. Lauer, after receiving the complete Chinese Grant documents from the Cleveland Clinic, further concluded that Dr. Wang's employment commitment at HUST and the Cleveland Clinic violated NIH overlap provisions and created a conflict.  Specifically, two Chinese grants required Dr. Wang to commit 6 months a year to his work at HUST from 2015 to 2019 and from 2017 to 2021, and another Chinese grant required a

---

[5] Wang had exclusive personal use of a three-bedroom apartment on the HUST campus.
[6] Wang claims that he relinquished this position.  However, as of February 20, 2020, Wang was still listed as Dean on the HUST website.

10 month a year commitment to his research at HUST from 2015 to 2018, all while being fully employed at the Cleveland Clinic and working on NIH funded research.  In addition, in all three of the Chinese grant applications, Dr. Wang failed to disclose that he was still fully employed at the Cleveland Clinic and, instead, stated that his employment with the Clinic ended in 2004 on one of the applications and in 2008 on the other.

35.     Also, during the April 20, 2020 teleconference, Dr. Lauer identified an additional conflict of interest.  Dr. Wang failed to disclose on NIH grant applications that Dr. Qiuyun Chen, a member of Dr. Wang's research team at the Cleveland Clinic who was listed as co-investigator or Senior Key Personnel, was his wife.[7]  The failure to disclose the financial interest of his wife violated NIH's Standards of Conduct Section 4.1.30.  Dr. Wang also kept the fact that Dr. Chen was his wife from the Cleveland Clinic, which was a violation of CCF's COI policies.

36.     Finally, Dr. Lauer stressed that the requirement to disclose any possible overlap rested with Dr. Wang as the PI on the grants, and that NIH relied primary on the honor system.  NIH's GPS made it clear that it was the PI's responsibility to disclose any possible overlap to the NIH for it to analyze the overlap and reach a conclusion.  The PI was not to reach that conclusion independently and then decide whether to disclose the overlap to NIH.  Dr. Lauer advised that had NIH been aware of the direct scientific overlap between the CNSF and NIH grants, Dr. Wang's HUST deanship(s), and the significant overlap in Dr. Wang's commitment of interest

---

[7] NIH required recipients to establish safeguards to prevent employees, consultants, members of governing bodies, and others who may be involved in grant-supported activities from using their positions for purposes that are, or give the appearance of being, motivated by a desire for private financial gain for themselves or others, such as those with whom they have family, business, or other ties.  NIHGPS 4.1.30

between his NIH and CNSF research grants it would not have funded the NIH grants in question

in their entirety.

**GRANT OVERLAP BETWEEN NATIONAL NATURAL SCIENCE FOUNDATION OF CHINA (CNSF) AND NATIONAL INSTITUTE OF HEALTH (NIH) GRANTS**

      37.    The Cleveland Clinic conducted the following analysis and Factual Submission

regrading CNSF Grant 31430047 and NIH Grant RO1 HL121358:

Chinese Grant: CNSF Grant No 31430047:

> Application date: Unknown.
> Award Date: Unknown
> Research Plan: January 2015 through December 2019
> Status: Dr. Wang maintains that this grant was among those he "relinquished" through an exchange of correspondence dated September 10, 2018.
> End Date: Dr. Wang states the grant was scheduled to end on December 31, 2019.
> Budget: According to Dr. Wang, the five-year budget was $480,000

NIH Grant: RO1 HL121358:

> Application date: Application resubmitted on November 5, 2013.
> Just-in-Time Submission: May 1, 2014.
> Award Date: No NOGA, but first RPPR says grant period is July 15, 2014 through April 30, 2018.
> Research Plan: July 15, 2014 through April 30, 2018
> End Date: According to Dr. Wang, the grant entered a one-year no cost extension period on May 1, 2018 that was scheduled to end on April 2019.
> Budget: According to application, the cumulative budget for all four years is $3,650,294.

**I.**    **Overlap**:

      38.    Under NIH grant rules, "overlap" between or among research grants is not

permitted and must be avoided or mitigated.  Overlap may be scientific, budgetary, or involve

the commitment of an individual's effort greater than 100%.

II.     **Scientific Overlap**

39.     According to a notice issued by the NIH in 2003, (NIH NOT-03-029), and other

sources, "scientific overlap" is defined as follows:

> Scientific Overlap occurs when: (1) substantially the same research is proposed in more
> than one application or is submitted to two or more different funding sources for review
> and funding consideration, or (2) a specific research objective and the research design for
> accomplishing that objective are the same or closely related in two or more applications
> or awards, regardless of the funding source.

40.     In January 2019, the NIH contacted Cleveland Clinic by email and asked for

information about Dr. Wang's activities in China and his Chinese grants.  In response to

questions from the NIH, Dr. Wang misled the Cleveland Clinic and informed it in writing that

there was "[n]o overlapping between NIH RO1 HL121358 and all 4 Chinese grants."  Dr. Wang

provided the Cleveland Clinic with documents relating to the four Chinese grants, which the

Cleveland Clinic paid a vendor to translate into English.

41.     The Cleveland Clinic asked three of its scientists to review the translation of the

Chinese grants and compare them to Dr. Wang's NIH grants - including RO1 HL121358 - to

determine whether there was scientific overlap.  In January 2020, the reviewers reported that

there may be potential scientific conceptual overlap between several of the NIH and CNSF

grants, and some areas of "direct scientific overlap."  The Clinic reviewers also concluded that

neither Dr. Wang, nor the Clinic made the necessary disclosure of this overlap to the NIH.

42.     Initially, the Clinic reviewers determined, based on Dr. Wang's false information

that there was no overlap in the families used between the NIH and CNSF research, that the use

of different cohorts of families - families from the U.S. in the RO1 and families from China in

the Chinese grant - provided a basis to differentiate the work to be performed under the two

grants, and there was no overlap, even though the two grants sought to identify the same rare

18

genetic variants linked to coronary artery disease and shared conceptual overlap in their overall approach.

43.     However, during the March 3, 2020, interview, CCF asked Dr. Wang to identify the families that he used in each grant.  At that point, CCF determined that Dr. Wang had previously lied to CCF, as he admitted now that the subjects sequenced under the two grants were not entirely different.  Specifically, of the 28 families referenced in the Chinese grant for whom Dr. Wang would be conducting gene sequencing, at least 21 were American families; the same families Dr. Wang was using as a basis for his work under the RO1 awarded by NIH. These families had donated genetic material over the years under a multi-year, privately-funded cardio vascular disease research program at CCF called Genequest.

44.     Dr. Wang also admitted during this interview that in 2015, he hand-carried samples of biological material from Cleveland to China and delivered them to WuXi App Tec for whole genome sequencing of the biological material collected from the CCF's Genequest families.  Dr. Wang advised CCF that he paid WuXi $171,900 in eight payments between 2014 and 2015 for the whole gene sequencing, and that this money was from funds awarded under a NIH RO1.  In addition, Dr. Wang changed his initial story to CCF when asked about the location of the biological materials.  Initially, Dr. Wang told CCF that the materials had been completely used up during testing at CCF, but during this interview he admitted that the remaining biological material from the U.S. donor families was sent by WuXi App Tec to HUST in Wuhan, China, and this biological material remains stored in Wuhan.

45.     The reviewers also concluded after their analysis of one of the NIH grants with the corresponding CSNF grant that "it appears that there was a degree of scientific overlap between these two grants," based on the fact that the families used in both studies were mostly the same.

46.     Dr. Lauer advised that the NIH concluded that the use of the same family members in both the NIH grant research and the CSNF grant research constituted direct scientific overlap.

III.     **How is Scientific Overlap Detected?**

47.     Overlap can only be identified by a researcher's home institution or by the NIH when all of the grants from which overlap may arise are disclosed.  Dr. Wang did not disclose the existence of his Chinese grants to the CCF (or to the NIH) until January 27, 2019, after the NIH sent its correspondence to CCF on January 14, 2019, and only after CCF asked Dr. Wang directly about the grants based on NIH's inquiry.  In addition, in his January 27, 2019 email, Dr. Wang attempted to minimize any scientific overlap between the NIH and CSNF grants and, specifically, referenced only CSNF grant number 91439129 and stated it "[H]ad no overlapping with any current or past NIH grants."  However, once CCF was able to obtain a translation of all of the CSNF's grants, as discussed in the previous paragraphs, the CCF reviews and the NIH concluded that the research in CSNF grant number 31430047 – a grant not disclosed by Dr. Wang in his email – constituted direct scientific overlap with NIH grant number RO1 HL121358.

48.     On February 1, 2019, CCF interviewed Dr. Wang regarding NIH's inquiry and the overlap issue raised by the NIH's inquiry, and again Dr. Wang failed to disclose CSNF grant number 31430047, and instead lied and advised CCF that none of the work he previously

performed under his foreign grants materially overlapped the work he performed under his NIH RO1s.

**IV.  Absence of Disclosure of Chinese Grant as "Other Support" in Submissions Relating to RO1HL121358.**

**Opportunities for Disclosure of the Chinese Grant as "Other Support"**

49.  *Grant Application*:  Dr. Wang submitted his application for RO1 HL121358 on November 5, 2013.  The application calls for the disclosure of any "Ongoing Research Support." Because the Chinese grant appears not to have begun until January 2015, it may not have been "ongoing" in November 2013.  If it was not ongoing, Dr. Wang would not have been obligated to disclose it at this point in the application process.  However, pursuant to the NIH's application guidelines, the requirement of disclosure was an on-going obligation and needed to be disclosed in January 2015.

50.  *Just-in-Time*:  NIH gathers additional information as a grant application moves through the evaluation process.  Just prior to the NIH making an award decision, the agency seeks current information from an applicant through a process called "Just-in-Time."  At this stage, an applicant is required to disclose all of his or her active and pending research support. The NIH Grants Policy Statement states:  "Information on other active and pending support will be requested as part of the Just-in-Time procedures…Other support is requested for all individuals designated in an application as senior/key personnel…."  When active or pending support is disclosed at this stage, the NIH asks applicants to also disclose whether the applicant is aware of any overlap.

21

51.     Dr. Wang did not disclose this Chinese grant as active or pending when he submitted the Just-in-Time on May 1, 2014.  While the Chinese grant appears not to have been active until January 2015, it is unknown to the Cleveland Clinic if the grant could have been considered to be "pending" at this time.  If it was pending, it should have been disclosed.  If it was not pending at this point in time, the disclosure was required in January 2015.

52.     *Annual Progress Reports*:  NIH also requires that each year, investigators working under awards file reports with the agency describing, among other events, the progress that has been made toward achieving the research aims described in the application.  In these Annual Progress Reports, investigators are also required to disclose any changes in the categories of information that NIH collected at the Just-in-Time stage, including changes in Other Support.

53.     Dr. Wang submitted the first Annual Progress Report under RO1 HL121358 on March 16, 2015.  Question D.2.c. on the Annual Progress Report form seeks information on "Changes in Other Support."  The overlapping Chinese grant (CNSF 31430047) appears to have begun in January 2015, and was scheduled to run through December 2019.  Accordingly, it should have been disclosed in this progress report by Dr. Wang as a change in other support, and it was not.[8]

---

[8] Cleveland clinic reviewers also opined, "it appears that another Chinese grant awarded to Dr. Wang, CNSF 9149129, "Identification of New Signaling Pathway for Vascular Remodeling – also began sometime in January 2015, and was scheduled to run through 2020.  As a result, this grant should have been disclosed as well."

54.     Dr. Wang filed another Annual Progress Report under RO1 HL121358, on March 11, 2016.  Again, Question D.2.c. on the Annual Progress Report asked for any "Changes in Other Support."  Both of the Chinese grants referenced above appear to have been active at this time, but Dr. Wang disclosed neither in response to his inquiry.

55.     Dr. Wang filed another Annual Progress Report no March 8, 2017.  Again, Question D.2.c. asked for the disclosure of any "Changes in Other Support."  Dr. Wang again failed to disclose either Chinese grant.

56.     The form for the Annual Progress Report contained a certification of truthfulness and accuracy.[9]

57.     Dr. Wang failed to disclose to NIH and/or the Cleveland Clinic that he was under an obligation with the Chinese government to share his US-funded research with entities located in China in any of his annual disclosure requirements.  In addition, Dr. Wang did not disclose his positions as Director of the Human Genome Research Center and Dean of the College Of Life Sciences and Technology at HUST.  The Cleveland Clinic and NIH had not granted Dr. Wang express permission to share US-funded research with entities in China.  Dr. Wang did not disclose his CNSF contracts to NIH during the process of applying for his current NIH grant, and he also failed to disclose these facts on prior NIH grant applications, although he had conducted grant science research from 2012 - 2020.  Based on my training and experience and the facts as

---

[9]In a March 2019 interview with Cleveland Clinic executives, Dr. Wang stated that it was not until September 2018, that he was aware that foreign grants needed to be disclosed to the NIH.

set forth in this affidavit, there is probable cause to believe that Dr. Wang committed violations of Title 18, United States Code, Sections 287 (False Claims), and 1343 (Wire Fraud).

## <u>CONCLUSION</u>

58.     Based on the aforementioned factual information, Affiant respectfully submits that there is probable cause to support a complaint and arrest warrant charging Dr. QING WANG, a.k.a. KENNETH WANG for knowingly making or presenting to any department or agency of the United States, specifically the National Institutes of Health, any claim upon or against the United States, or any department of agency thereof, knowing such claim to be false, fictitious, and fraudulent and to obtain money or property by means of false or fraudulent pretenses, representations, or promises, in violation of Title 18, United States Code, Section 287 (False Claims); and, for executing and attempting to execute a scheme and artifice to defraud and to obtain money and property from NIH, by means of false and fraudulent pretenses, representations, and promises, in violation of Title 18, United States Code, Section 1343 (Wire Fraud).

59.    Affiant, therefore, respectfully requests the attached complaint and arrest warrant be issued authorizing the arrest of DR. QING WANG, a.k.a. KENNETH WANG.

Respectfully submitted,

*L. John Matthews*

L. John Matthews
Special Agent
Federal Bureau of Investigation

Sworn to via telephone after submission by reliable electronic means. Fed. R. Crim. P. 3, 4(d), and 4.1, on this 12th, day of May, 2020

*William H. Baughman, Jr.*

HONORABLE WILLIAM H. BAUGHMAN, JR.
UNITED STATES MAGISTRATE JUDGE

25